Some of us have our iPads up here and can access the record sites, so please be sure these record sites are accurate. That's always a nice touch. So, with that, we will proceed to the first case of the morning, 17-50294, United States v. Sarli, and we'll begin with Mr. Lynch. Thank you, Your Honor. May it please the Court, I'm Phil Lynch and I'm here today for Arturo Sarli. This appeal raises two issues. I'd like to talk about the Confrontation Clause issue first, if that's okay with the Court. This was a very simple case. The question in the case was, did Mr. Sarli know that there were drugs in the box in his truck? So, it's a knowledge case. And that's why the admission of the testimony, the officer's testimony conveying the substance of the tip from a confidential informant who had an established working relationship with the government was error. How does that testimony show knowledge? It shows knowledge in a couple different ways, Your Honor. If you look at the entire thing, right before the part that the objection was made to, he says, I received information about Arturo about three or four weeks before. There's no objection there, but this is important I think to consider in the context. Then the objective testimony, which is the substance of the particular tip on that day, which is that Arturo, a white male named Arturo, in a, excuse me, a Hispanic male named Arturo, in a white avalanche, is making deliveries of narcotics. So, he's saying that Arturo is making narcotics. That is evidence that Arturo knows what he's doing. But the jury can infer from that. I'm sorry. This is helpful. So, this testimony, I'm looking at page 696 of the record. Yes. The answer was, on that certain date, the information I received was that there was a male Hispanic man by the name of Arturo driving a white avalanche that's going to be delivering narcotics. Yes. That's the problem. Yes. And so that someone, not just someone, but a confidential informant with an established relationship with the police who was testifying. But wasn't the defense accusing the prosecution of, quote, rookie, well, not the prosecution, but the officers of, quote, rookie mistakes, and so they were needing to explain kind of that they weren't making rookie mistakes, they were, in fact, following up on a tip? I don't think that's the case, Your Honor. That term was used in closing argument, but it was not used earlier. There were things that were said that were valid cross-examination, such as Sergeant Perez made a statement that Mr. Sarli had said, I don't want to go to prison, and my wife had nothing to do with this. She doesn't know anything. Now, both of, that statement was not in the report. Two and a half years later at trial, after the incident, Sergeant Perez remembers that. So, that is challenging a legitimate thing. That's not challenging their investigation in a bad way. But then, how is that a rookie mistake? I mean, you're saying he's making up a story. That's not a mistake. That's a lie. What was the rookie mistake that y'all were accusing the officers of? It's odd, Your Honor. If you look at page 759 and 760, which is where the term rookie mistake occurs, he doesn't really follow up on it. As best as I can tell, what he really means is the officers assumed, because they found Mr. Sarli with the box and there were drugs in the box, that Mr. Sarli was guilty and that they should have investigated. Additionally, he was not, and I think this is really important, Judge Hanson, he was not challenging the beginning of the investigation. He was not challenging why did any officer do anything. He was saying, don't make the rookie mistake, which is terrible terminology in my opinion, but he said it. Don't make the mistake of assuming. You on the jury have to look at all of the evidence and determine whether it allows an inference of knowledge beyond that. Your construction of the rookie mistake is that the jury would be making one by ruling for the government? No, Your Honor. Okay. He said the term rookie mistake. That wasn't my reading of it. I put it with the officer, but I honestly cannot tell from the record in that 75960 what he thinks the rookie mistake is. I think it's just bad language. I'm not denying he said it, and I'm not denying that that's critical of the officers, but I can't tell what he's saying there. I think he's saying the officers were too easy to think they had this case wrapped up because this is an open and shut case. There's drugs in a box in his truck. Are you conceding that if the rookie mistake comment referred to the initiation of the investigation or to the stop of Sarli, that the comment on the confidential informant's tip would be okay and not a confrontation clause violation? Absolutely not, Your Honor. Okay. Absolutely not. No. But I'm saying, let me try to answer that in two ways. First, let's look at when it was admitted. Detective Contreras was the government's seventh witness, okay? There was no need, seven witnesses in, to be talking about something that happened at the very beginning of the investigation that involved out-of-court statements from a confidential informant. Well, in light of that he was the seventh witness, was the testimony regarding the confidential informant cumulative of other testimony that would have showed Mr. Sarli's knowledge? No. Okay. Why is that? Because the question really comes down, this is a hidden drug case, in the same way that it would be if it were at a port of entry at the border. There's drugs. Okay, but how many people get paid a bunch of money to transport kitty litter? That. So isn't that infer knowledge? If somebody says, I'll pay you $1,000 to take this box of kitty litter down the street, I got to know that's a little weird, okay? If we knew it was $1,000, Your Honor? Or even really any sum. That's just a very strange thing. People don't typically do that, just sort of randomly give someone kitty litter to transport, okay? So that would put you on notice that this is kind of weird. Like, why am I being asked to do this? This isn't UPS being given a box, a package to deliver. It's some random guy that's supposed to be delivering kitty litter. Doesn't that give him notice? If we were on the jury, Your Honor, that would be something that we could consider. The problem is the government added in improper evidence that tainted the jury's consideration. That's a jury question. What did it add? What did it add? What did it add? It says, I think, it adds that a real sense that he knows what he's doing. Because if you look at the harm on the whole record, you have that initial comment about he'd received information about Arturo three or four weeks before. This is the testimony. Yes. That's at, I don't know what you're catching me with. I think it's 94 or so. Yeah, that's where it is. And then at 703, so then he says that But first, the first part, did you object to the first part? He did not object to the first part. Okay. So the first part that came in without objection. Yes. And that's the part, okay. So part of it came in without objection, but continue, sorry. And I think, Your Honor, that that goes to the harm. I didn't raise it as an error because it would be a plain error. It's not objected to that part. But I think it's considered, when you're considering the harm, you look at the whole record. So it adds to that. Is that a problem for you in the sense that it's unobjected to when it's brought in the fact that the officer had a confidential informant, right? That was unobjected to. How did you know about this? Confidential informant. What did the subsequent objected to comments add to that? They added something very specific. And we look at 695 and 696. They say, what did I know on that certain date? I knew a white male, excuse me, Hispanic male in a white avalanche named Arturo was making narcotics deliveries. So it's the detail. That's providing details. I'm not saying I disagree with this, but it's already admitted that there was information from a confidential informant. That's a quote. That's correct. This later testimony that you did object to is simply fleshing that out a little bit more. Well, there's testimony about the fact of the informant, okay? And I don't think, I think what this Court has cautioned and did so very recently in United States v. Sosa and last year in United States v. Kizzee is you have to be careful, extremely careful with this kind of background information. And so the existence of an informant may or may not be objectionable. If it were only that, I probably wouldn't be here, Your Honor. But when you flesh it out with detail and the detail is on that certain date, this particular guy in this particular car is delivering narcotics. And then to go back to Judge Duncan's question at 703, I think it's where he says at that certain time, the prosecutor asking, and there was no objection to this either, but I think in considering harm, did you know what he had? And the officer says, at that time, yes. So is your point merely saying I got information from a confidential informant that may or may not be inserting hearsay, but once you get the details, now you're starting to talk about what this out-of-court statement? I think that's correct, Your Honor. This Court's jurisprudence going back for decades has suggested that even the I got information can be potentially tricky. But given the particular facts of the case, it may be either admissible or harmless. But when you get into the details is where we're getting into a testimonial statement. I mean, I hear what you're saying. I just want to make sure I understand. When he tells you, I mean, his name, Arturo, the white avalanche. Correct. And then I'm looking here on 696, that's going to be delivering narcotics. Correct. So those are the details that you're talking about. Those are the details that you say were added that shouldn't come in and were harmful. Correct. And not cumulative. Yes. And that, and I think, again, in considering harm, if we look at the earlier comment that wasn't objected to about the three or four weeks and the later comment about did you know at that time what he had, yes. I see what you're saying. 694 is I received information from a confidential informant about three or four weeks ago and there was no objection to that. Okay. And the fact that we have it stretching in terms of harm from three or four weeks before to what he knows exactly at that certain time is really telling the jury we have a witness who knows that this man is involved in delivering narcotics. And that, Judge Haynes, I think is why this isn't just a jury was entitled to make that inference. Okay. I think that the admission of this testimony interfered with the jury's consideration of prejudice. So let me ask you this. If we disagreed with your position on the motion to suppress, which we haven't talked about, but agreed with you on the confrontation clause, then the right remedy is a new trial? Correct, Your Honor. With the evidence you want suppressed still coming in, but not the reference to the confidential informant. Or else procuring the confidential informant to come tell what he knows. Well, I think there's one interesting twist there. And I do think for the reasons I set out in my brief that the search, the repeated searches go too far. And we can talk about that too. But even if you were to disagree with me on the consent, it may be that there should be a hearing, if you have any questions, about what statements. Because it bothered me that the magistrate judge specifically asked the prosecutor, are there any statements? And there were no statements. And then two and a half years later at trial, we have statements. So it's possible that... A different error, though, right? Yes, it's possible. You haven't raised that. I raised it only as a, this was a problem that... Right. But you haven't raised that as... I haven't raised that. That that testimony should have been suppressed. And that's not the kind of testimony that gets suppressed. That's how you cross-examine the guy, it's not in your report, you're remembering it now. In this case, if we sent it back five years later or whatever, you mentioned it for the first time two years later, that's cross-examination. That's not... Because the fact that something's not in report doesn't mean it didn't happen. No, that's correct. And sometimes people don't put stuff in a report, but it did happen. But there might've been a fruits issue, is what I'm saying. So if you were to agree with me on the suppression issue, then... If we agree with you on the suppression error. Right, right. But my hypo was if we didn't, then what was the remedy? The remedy is a new trial with the suppressed evidence, but without the reference to the confidential informant, or alternatively with the procurement of the confidential informant to come testify and be confronted. That's the other option. That's correct, Your Honor. If they want to bring the informant in and there's cross-examination, then that's fine. The premise of... Sir... Yeah, go ahead. Oh, please. The premise of your yes, is that the error is not only an error under the Confrontation Clause, but that it's harmful. Oh, yes, it is. Harmful, right. It's harm... Which error? I'm sorry. The Confrontation Clause. You said, yes, you agreed with Judge Haynes, we should remand and retrial. But the premise of that is that it has to be harmful error. Yes. And it's harmful, I believe, Your Honor. We've talked about whether the information that came in through the informant's tip was cumulative. Now, what about the fact that Mr. Sarli confessed in a sense? I mean, doesn't that make whatever came in through the informant's tip harmless? No. So why is that? I think exactly your words tell us why, Your Honor, in a sense. That is a jury determination. Is that really a confession or is that just a scare? I don't want to go to jail for transporting kitty litter. I mean, how did he even know? If I thought I had a box of kitty litter and police were opening it up and sorting through it, how would I even know that it's in fact $60,000 worth of meth if I'm looking at what's going on? I wouldn't be going, my wife didn't do it. Don't put me in jail. I mean, that to me, there's no other way to take that. Well, the circumstances of the case, Your Honor, I think are important, right? He's been put off to the side. He's watched them rouse his wife, handcuff her, put her away. There's all sorts of things been going on for an hour. There's cops coming and going. There's dogs coming and going. I think it's a jury question, again, as to what they give it. Because as Judge Duncan said, it's innocent. Well, what does the record reflect about his quote-unquote confession? I mean, what do we have in the record that shows what happened at that point? It's just Sergeant Perez saying that when he and Contreras went to tell Sarli that Sarli was upset and crying and said, I don't want to go to jail. I don't think it's linked directly to the drugs. But I still would say, even if they said to him, and I honestly can't remember this being there, but perhaps my friend will correct me. In considering, I mean, in considering harmlessness or harmfulness, we have to consider the totality of the evidence. Isn't that right? That's correct, Your Honor. But this is a constitutional violation, so it's harmless beyond a reasonable doubt. The burdens in this are actually kind of odd. In the under the Duran case, 737, Fed Third, 988, the government has the burden of showing it's not testimonial. And then we do the harmless beyond a reasonable doubt. Judge Hall, you had a question, sir? Actually, Judge Duncan asked my question. It's about the harmlessness. Okay. Thank you. We reserve time for rebuttal. Appreciate it. All right. Mr. Richter? May it please the Court, Zachary Richter for the United States. I'll start briefly by just correcting what may be a misimpression, which is that the allegations of a botched investigation came up only in closing, in opening the defense counsel in district court at page 605 and 608 of the record. It started with the theme, appearances can be deceptive. And he emphasized that the police in this investigation had been misled. So I think it was perfectly fair for the prosecutor in this case to go to the witness who had had contact with the CI. He was the seventh witness at trial, but he was also the witness, the lead detective who had had the contact with the CI. Wouldn't it have been enough for him to testify, look, we were led there by a confidential tip. Why was it necessary? Well, why did he have to go on and say, man named Arturo, white avalanche, transporting narcotics? Because isn't that when you get into the confrontation clause problem, because that starts looking like testimonial evidence. In retrospect, we might say that the evidence was so, and we do say that the evidence was so but that goes to harmfulness. Right. That goes to harmfulness. And that's why we say the error was harmless. But I think in the context of the trial, what the prosecutor was thinking was we have an opening statement that starts with appearances can be deceptive. We have these repeated attacks on the quality of the investigation. And so she was trying to link together why are these police looking at this situation. But that's only one aspect of the confrontation clause analysis, Your Honor. Of course, there's the whole preliminary question of whether it's testimonial, as your question suggests. And this case is indistinguishable from Polidor, in which there was a, there was actually a recording of this. No, go ahead, sir. There was actually a recording of the statement played for the jury that identified the person by first and last name. Yeah, but what was the statement? Where was it coming from in Polidor? The statement was from a caller who was calling to get the police to come intercept a person who was dealing crack cocaine. And the statement was there's a, this person, Kennedy Polidor, he's wearing a white shirt and green shorts. He's driving this kind of car, this color. That starts looking different. That starts looking like there's these kind of emergency cases, you know, where the statement was made in a different context and you can reasonably infer that it's not intended to be testimonial. Here you've got a confidential informant speaking to the police. It's, do you see how, I mean, maybe you disagree, but isn't that a little bit different for confrontation close purposes? Well, actually in Polidor, this court said that there wasn't an emergency. Okay. And the caller in Polidor was calling 911 to get the police to come. So there's not a big gap between these circumstances. What's the test to figure out whether a statement is testimonial under the undercurrent? I know this area of the law has been developing since Crawford. So what's the test that we look to? Under Ohio v. Clark, the test is whether the primary purpose of the conversation was to create a substitute, an out-of-court substitute for in-court testimony. So I got to tell you, prior precedent rule aside, I'm not sure I get Polidor. I mean, isn't the whole point of somebody calling in, whether it's the Polidor fact pattern or an informant, isn't it kind of the idea to put somebody in jail? Well, the fact that the conversation might have the result of... Well, not just the result, the purpose. Let's accept this primary purpose test. Obviously, there have been justices who have criticized it, but let's just accept it on its face since it's the standard. Isn't the purpose of an informant to inform about crime? Well, in this instance, the source in this case was telling the police there are narcotics at this location with this person at this particular time, and that's what the court in Polidor relied on. That's the thrust of Polidor. It's not about an emergency or not. And like I said, the court in Polidor said there wasn't an emergency. But nonetheless, one of the factors for the primary purpose test is... What I'm hearing from you, and pardon me if I'm just missing it, what I'm hearing from you is we're governed by Polidor. I'm asking you to sort of set that aside and ask just as an original matter, understanding what the Supreme Court's telling us in Crawford, why is this not literally to provide statements that should be used in court to put somebody in prison? Well, going past Crawford, as you all have acknowledged, the test has developed over time. One of the factors that the Supreme Court identified was whether the witness is talking about something that's happening in that moment versus talking about past events, and that's the thread of the Supreme Court's logic that gets picked up in Polidor. So even setting Polidor aside, if you carry that thread to this case, you have a source who is saying to the police... This is fixing to happen. This is exactly what's happening right now. This person is in this location with these drugs. And because that is happening right now, the officers can arrest that person with the drugs and then use the drugs, which can be used to make the prosecution. You don't need the source's statements necessarily to make out a drug prosecution, as this Court has observed. And that's why we... Let me ask you this, because I understand the rookie mistake rebuttal concept. In fact, I'm the one who raised it in this oral argument discussion. But in the actual closing argument, the prosecutor is talking about that and then says, based on the information, Contreras was looking for an avalanche, found Arturo, they saw the avalanche, they saw the person, they ran the that it was Arturo, they stopped, they got the warrant, and then they said they were looking for a drug dealer. These factors all go to knowledge and the intent to distribute. Because when we come to the end, what he's telling you is that he had the box to deliver and he doesn't know what it was, okay? So that's record on Appeal 772. So isn't that saying that instead of it just being kind of the background of how we got here, this confidential informant tip is the proof of the knowledge that Arturo wasn't just taking some kitty litter, oh my gosh, I need a little extra money, I'll just deliver some kitty litter, whoops, there's $60,000 of meth in here, but rather that he had knowledge. So isn't that, even if the original purpose in eliciting the information may have been okay or non-testimonial, isn't this use arguably a problem? The prosecutor is mixing a lot of different threads together in that closing argument. And I'd like to point out that that's also the rebuttal and not the initial closing argument. In the initial closing argument, there was nothing about the tip mentioned whatsoever. It was only after the rookie mistakes. Okay, but you still, I mean, and I have no problem with rebutting the rookie mistake argument. I think that's totally appropriate in rebuttal. And if all she had said is, look, we had an informant that told us to be there, we weren't a bunch of rookies, you go, okay. But then she takes it to this point of those factors all go to knowledge and the intent to distribute. What is that referring to other than the tip? Yes, and I acknowledge that the prosecutor did say that. She did talk about knowledge, and she talks about all of these factors put together to add up to knowledge. But she wasn't just talking about the tip as proof of knowledge. In that same passage that you're quoting from, she also went on to talk about the fact that there was two kilograms of high purity meth that he had said that he had been paid to move the box from one unknown person to another unknown person in two different parking lots, that he did break down into tears when he was confronted with the meth, that he did say, I don't want to go to prison. My wife has nothing to do with this. She mixed all those factors together. In other words, we can affirm even if we find a confrontation clause violation. That's correct under the harmlessness doctrine, Your Honor. You have to show it's harmless beyond a reasonable doubt if it is an error. That's a high burden. It is, but it is met here, and I can refer to the court's recent decision in Carmona-Ramos where there was a similar confession, there was similarly strong evidence, and even though the prosecutor did mention the potential confrontation clause statement in the closing argument, nevertheless, this court on that evidence found the error to be harmless. We do have a couple of cases that strongly criticize the prosecution and refuse to find harmless error as a result because of the use of the confrontation clause violation statement in the closing argument, right? You know what cases I'm referring to. That's right. So how can you distinguish those? I mean, I'll get the name for you in a second. Sure. So I believe in both of those cases, the statement that was relayed that violated the confrontation clause was one that was critical to the prosecution. So, for instance, there's the 28J case that Mr. Lynch brought to the Court's attention, Kizzee. In that case, the statement from the post-arrest statement from the person who had been caught with crack cocaine after visiting Mr. Kizzee's house was the only definitive evidence showing that this defendant, Mr. Kizzee, had been dealing in crack because they didn't find any crack when they went to the house and they took apart the plumbing and everything else. They found only two-tenths of a gram of crack. So they needed that testimony, and there wasn't any confession in that case. In the other cases, similarly, there are... So you're saying catching him with the drugs and his breakdown at that point is really enough to override any other problem? That's so overwhelming. Yeah, I'm sorry, Your Honor. What if you were, you know, thinking you could make some extra money. Somebody gave you kitty litter, said they'd pay you. You took it. You really thought it was kitty litter. You didn't understand why they wanted you to transport it, but you just took it. And then all of a sudden, you're realizing, oh my gosh, this is math or it's something. It's something that's exciting the police. So it's something other than kitty litter. Wouldn't an ordinary person, innocent, break down? Because this isn't going to be a good situation, right? If you're innocently caught with a bunch of drugs in your car, you're going to kind of break down because, wow, that's big, right? And it's just going to be your word against everybody else's that you didn't know. So wouldn't that be another construction of his comment? Not in light of his confession that he was being paid to move this box. What did he confess? Well, where in the record? So I had a conversation with your friend on the other side about what does it mean to say he confessed? Can you help me? Where in the record can we glean what exactly was the substance and the circumstance of that confession? 702 to 703 is, I believe, the record citation there, Your Honor. And what he said is that he had been paid to take the box of cat litter from a Walmart parking lot from a person that he did not know, a man he did not know, and drive it to the restaurant parking lot where the police encountered him and turn it over there to another person that he did not know. So it's somewhat fanciful to suggest that this would just happen in the ordinary course and that somebody would think nothing of this happening. But is the problem that the jury hears that, agrees with your inference, and then says, and that stuff about the confidential informant, that really seizes it on knowledge? Well, in past cases where the evidence has been as strong as it is here, even without the confidential sources statement, this court is affirmed based on harmless error. What is the knowledge requirement under the statute that he was convicted under? He has to know that there was a controlled substance. He doesn't have to know which controlled substance it was. He doesn't have to know the quantity. So all he has to know is that it was a controlled substance. Was there any testimony that people used kitty litter to mask the odor of controlled substances? Could the jury have relied on that? If there was, could the jury have relied on that? I don't know if there was. Yes, there was testimony from one of the detectives. In fact, the detective who recognized that the box might contain methamphetamine and found the methamphetamine, that the charcoal-based nature of cat litter masks odors. And for that reason, it both might have fooled the dogs. And the jury can infer, why is this a box of cat litter? Why use this? Forgive me for asking what sounds like a dumb question, but judges don't ask dumb questions. Is it evident from the record that this was a box of kitty litter? Yes. Did it say kitty litter? It says it's a yellow box that says tidy cats on the outside. And there are pictures of it in the record. Unfortunately, I don't have the exact page, but it's easy to find. What's that? Pictures of cats. There might be a face of a cat. I can't recall, but yeah, the tidy cats. When you open it, the litter is on top. I don't know. The record isn't clear on whether the litter was on top, but there was litter in the box. There is testimony to that effect. I do want to get to the suppression question, since my time is drawing to a close, and emphasize that there are three alternative bases on which this court can affirm the district court. There's consent, there's probable cause, and then there's, of course, inevitable discovery through an inventory search. And on the question of consent, this Court has again and again stated that a defendant has the right to refuse consent, and the defendant was advised of that right in this case before he consented. And if the defendant wants to limit his consent in any way, it's incumbent upon him or her to do that. What's your response to the argument that if he had wanted to limit the consent, he couldn't because he was cool in his heels and handcuffs in the back of a cop car? This Court has said that if the defendant wants to limit the consent, he or she needs to do that at the outset of the search. And also, the police, this Court said in Mendoza v. Mendoza-Gonzalez, that police don't have to conduct a search in such a way that a defendant has an opportunity to object at any point. So the police don't have to give a person that opportunity once that consent has been granted and is unlimited in time. Was the consent given before or after he was shackled in the back of the car? Before he was arrested, it was when the consent was given, and it was given on Tuesday. So your position would be he wasn't feeling, you know, desperate and having to consent because he's sitting there in the back of the police car in handcuffs? The defendant has waived any question as to his voluntariness, the voluntariness of the consent on this appeal, Your Honor. And the district court found, and there's nothing to undermine the findings here, that the consent was perfectly voluntary, despite Mr. Starley's testimony that he did not consent at all. So since we do have What's your response to the argument that the search came to a natural end with the dog sniffs, the unsuccessful dog sniffs? I think this Court's decision via Franco-Elizondo from July is the answer to that, Your Honor. Essentially, this Court said that the dog sniff is only one part of the calculus and it's not dispositive. So what we do have testimony in this case that there were, at page 499 of the record, that this is a vehicle that has lots of compartments. And in fact, when you watch the video, you can see there are compartments on the side of the bed of the truck that the police are getting into and drawing all kinds of items out of. So this is a search that's going to take a little while using all the different modalities that the officers The video's in the record, right? That's correct. And does the video show the box of cat litter? You can't see the box of cat litter because the gate of the pickup truck is up and the cat litter is inside that. You do see the moment of discovery because all the officers rush over to that place. So you know where in time it happens. And that's within five minutes of the second dog. Does the record reflect that while Mr. Sarli was in the police car, that he could see that going on, the police rushing over to the tidy cat box? I do know that there was testimony that Mr. Sarli had a view of some of what was going on with the search, but I don't know exactly what he saw at that moment because he didn't testify to that effect. That I recall, I'd have to go back. He did testify at the suppression hearing and there was testimony from him that he could see what was going on with at least with some of the search. But he was consenting to the search of the truck? He had consented to the search of the truck. Not a part of the truck, but the whole truck. He consented to the whole truck. He did not restrict in time or method or any section of the truck where you can only look in the front or back or anything like that. And the entire search took less than an hour as I understand it? That's right. It was approximately 15 minutes, more or less. We don't know exactly when the search began, but of course we know exactly when the search concluded from the video. So this was all over in less than an hour. And if you look at the video, then you'll see that officers are trying one method, the dogs come in, the officers try, but there's overlapping modalities being used to try to search this vehicle and find this. And for that same reason that we say that probable cause did not dissipate here. Probable cause only requires a fair probability that the police would locate contraband in a particular location. We'd have to disagree with the district court, though, if we were to affirm on that basis. That's right. But the district court didn't have the benefit of Villafranco-Elizondo, and the district court's logic was premised on the idea that the quote-unquote most intensive part of the search was the dog sniff. And of course we know from Florida v. Harris that the dog sniff is only part of the calculus here. Looking at the totality, this confidential source had a three-for-three record of providing tips that led to convictions, and then Mr. Lynch would also contribute to probable cause, and there was still a fair probability, especially given what we know now, which is that it was likely that the odor of the methamphetamine was masked by the cat litter. So for those reasons we would say that this court on de novo review could simply disagree with the district court and recognize that Villafranco-Elizondo has changed perhaps what the district court would have said in retrospect. Okay. Thank you. Thank you. Mr. Lynch, let's hear your rebuttal. Thank you, Your Honor. Judge Ho, I don't think it's a matter of does Polidor go to the side or anything. I think that Polidor is simply an opposite here. Polidor is, as a couple of you have suggested, a little bit odd in the jurisprudence here. And there's a dissent by Judge Southwick, of course. There's a dissent by Judge Southwick, who also wrote the Taylor case, which is at 545 Fed Third, that found in similar circumstances to this it was hearsay testimony that came in through an agent that habeas relief was warranted. So I think that this sort of testimony is, in fact, testimonial, is fairly well established by most of the jurisprudence. But Polidor, another important thing about Polidor— Your point basically is we don't have to go on bonk. We can do this even accepting Polidor. I think that's correct. They themselves say under these limited circumstances. And another thing I would add to that, I know I'm kind of killing this point, and maybe I shouldn't, is that Davis and Hammond both involved 911 calls at the Supreme Court, and they came out different ways. So what it tells us is the primary purpose test looks at the circumstances of the particular case. And what Clark tells us is that among the things you look at are the relationship. And we have a formal relationship between a confidential informant and an officer that's being used to get other convictions. I mean, I'm sure I'm misremembering, but do we have confrontation clause cases involving this precise scenario where the confidential informant talks to the police and then someone's allowed to testify, maybe the police, about what the confidential informant said? Do we have that anywhere? I'm not sure that we have it in—we have it very close in Farr v. Henderson, which is 464 fed second. We have a similar thing in United States v. Hernandez, which is 750 fed second. This Court and Hernandez went off more on a due process theory, that that violated due process, but I think that the Crawford line of cases has kind of locked in that this— The first one you said was Farr, right? Farr, yes. I think it's F-A-R-V-E, that this is more of a confrontation clause. But the important point being that this Court has repeatedly said that this sort of testimony is improper and is a constitutional violation. You have two minutes. Do you want to take a shot at explaining why we can't affirm even if we accept your confrontation? Yes. That's where I wanted to go next, was I think that the problem is—and Judge Haines read to us from the prosecutor's argument. She uses it very strongly. As Judge Higginbotham said long ago in Kang, that when the prosecutor must have known the strength of that poison when he reached for it. And that's what happened here. She is saying, don't worry. Put your doubts aside. Don't think that this man was just nervous. Don't think this man was just scared, worried about what they take his wife into. We know he's guilty. All right. But what do you do with the consensual search and the knowledge that he's being paid to transport? Those two facts. Forget the confession. Again, if it were, if there were evidence in the record, Judge Haines mentioned $1,000. If there's evidence in the record of a substantial payment, then that might cut differently. But on a beyond a reasonable doubt standard, the mere fact— We just knew he was being paid. We don't know what. Correct. And under a beyond a reasonable doubt standard, I don't think that gets the government to where it wants to be. Oh, so you're saying they could not have proven their case without this evidence? No, I'm not, Your Honor. I'm saying that it tainted the jury's consideration of the evidence. You're saying if they had a reasonable doubt, then this might have solved that doubt. And then that's the problem. That's the problem under the Chapman beyond a reasonable doubt standard. Would the jury have reached the same verdict? Can we say that? Has the government established beyond a reasonable doubt that the jury would reach the same verdict? I don't believe we can say that on this record, and I would ask that you reverse. Thank you. Okay. Thank you. We appreciate everybody's arguments. And Mr. Lynch, I noticed that you're court appointed, and we appreciate your service, and we, of course, always appreciate the service of both sides. So thank you. The case is understood.